### HAMMOND v. S. TUTTLE'S SONS & CO.

(District Court, E. D. New York. January 16, 1919.)

WHARVES ⬅20(7)—SINKING OF BARGE IN SLIP—FAULT.

Evidence *held* not to show that the sinking of libelant's barge in a publicly used slip was due to fault of respondent in placing her there, but to her leaking condition causing her to sink when her bow rested on the bottom at low tide.

In Admiralty. Suit by John H. Hammond against the S. Tuttle's Sons & Company. Decree for respondent.

Macklin, Brown, Purdy & Van Wyck, of New York City (William F. Purdy, of New York City, of counsel), for libelant.

S. M. & D. E. Meeker, of Brooklyn, N. Y. (Herbert Green, of New York City, of counsel), for respondent.

CHATFIELD, District Judge. The libelant seeks to recover damages for the sinking of the barge Armstrong in a slip outside the drawbridge near the outer end of the Wallabout Canal, which lies just north of the Navy Yard in Brooklyn. This slip is immediately up the creek from a dumping board in front of which rubbish scows are loaded in deep water. These scows and other vessels generally seem to use the adjoining slip as a berth while awaiting their turn at the piers further up the creek, as well as at the dumping board.

The libelant's boat, which had shortly before been overhauled, and which is said to have been used as a grain boat just before the accident, and to have been reasonably tight, was brought to the creek on August 22, 1917. She was intended for the respondent's coal yard, and could not be taken up through the drawbridge to the pier for unloading that night. The respondent's representative, therefore, directed that she remain below the drawbridge until the next day. She was moored alongside of a light scow, which was waiting to get under the refuse dump, and remained there during the night. The next morning the light scow was moved and the Armstrong was put in the corner formed by the drawbridge and the dock. She was there moored at a distance of some 10 or 15 feet from the drawbridge and 4 or 5 feet from the side of the slip.

The tide table shows that it was high tide around 11:40 in the forenoon, and the captain of the boat testifies that he was again ordered to remain at the berth, as the respondent was not yet ready to unload the boat until the afternoon, and that, as the tide went down, the bow of his boat rested upon some hard substance, which allowed the stern to settle when the small amount of water in the boat ran toward the stern, thus tilting her until the water came up over her deck, ran in the hatches, and ultimately sent her to the bottom, where only the extreme bow and the roof over the middle was out of water.

There is testimony that the berth was used by deep draft vessels at all times prior to and after this accident. Such vessels rested on the

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

mud at low tide, and no obstruction has been indicated, except by the evidence as to the tilting of the boat. This is opposed by the testimony of the captain himself, to the effect that his boat was aground at the bow, and that she settled at the stern until the water came up over her decks.

Unless the boat was leaking, no such twist could be given by merely raising the bow, for the boat was afloat for the rest of her length, unless the amount that the bow was raised was much greater than appears to have been the case in this instance. The only way in which the stern could have been put under water was by an accumulation of water inside the boat. If this had been caused by the shape of the bottom of the slip alone, it is difficult to see how the boat could have remained in the slip over one or two previous low tides, without accident. If the injury was caused by some particular obstruction, which was close to the shore and over which the barge moved when the light scow was taken away, it is difficult to see why the respondent should be responsible for such a chance condition in a public or publicly used berth.

But, further than this, the testimony of the respondent's witnesses, that the sinking occurred in the morning, that the captain said his boat was leaking and was told it would be better to get a tug, that some one called with reference to pumping out the barge, and that the boat was seen before noon going down, is too strong to be disregarded.

The libelant has not sustained the burden of proof, so as to show that the accumulation of water in the boat, which caused it to settle at the stern, was not the result of ordinary leaking, or to show that the accident was not caused by the captain's mooring his boat so close, either to the drawbridge or the side of the slip, that it was resting on the bottom at the bow and in deep water at the stern, and that this ordinary strain opened the boat's seams sufficiently to send her stern deck under by the leaking then occurring.

The libel should be dismissed.